ST. PAUL FIRE & MARINE INSURANCE COMPANY, Safeway Stores, Inc. and Richardson Construction Company, Inc., Appellants,

v.

VULCRAFT, Appellee.

No. 12–87–00063–CV.

Court of Appeals of Texas, Tyler.

March 15, 1988.

Jim Echols, Tyler, for appellants.

Stephen W. Howard, Longview, for appellee.

COLLEY, Justice.

This is a construction law case concerning the validity of a derivative claimant's lien.

The claimant, plaintiff/appellee Vulcraft, sought joint and several recovery against the owner, defendant/appellant Safeway Stores, Inc. (hereinafter Safeway), the original contractor, defendant/appellant Richardson Construction Company, Inc. (hereinafter Richardson), and defendant/appellant St. Paul Fire and Marine Insurance Compa-

ny (hereinafter St. Paul), the surety on a bond indemnifying against the lien claim.

The trial judge in a bench trial signed a judgment in favor of Vulcraft for its lien debt, prejudgment interest, attorney fees, and postjudgment interest. We will affirm that judgment.

The two principal issues are: (1) whether Vulcraft gave timely and proper notice to Safeway and Richardson; and (2) whether Vulcraft timely filed its lien affidavit.

The record reveals the following facts and events. In early October 1983 Safeway contracted with Richardson for the construction of a retail store building in Center, Texas. Richardson subcontracted with Escal Fabrication and Construction Company, Inc.[1] (hereinafter Escal) to furnish certain specially fabricated steel girders, joists, bridging, and decking. Escal, in turn, subcontracted with Vulcraft to furnish certain of such material by a purchase order dated October 19, 1983, for 38.6 tons of joists and bridging, 9.9 tons of girders, 319 squares of 1.5B 22–gauge roof decking, and 22 squares of .6c, 28–gauge galvanized decking. The agreed price for such materials was $37,647.12.

Vulcraft accepted the order, confirming it on October 25, 1983. The uncontroverted documentary evidence reveals that the material was delivered to the job site in Center on three separate days, December 19, 1983, December 20, 1983, and January 5, 1984. John Bass, Vulcraft's comptroller, testified that the major portion of the material was delivered in December, 1983, and only one bundle of .6c steel decking was delivered under the Vulcraft–Escal subcontract on January 5, 1984. Bob Richardson, president of Richardson, testified that "98% of the materials called for by the Vulcraft–Escal subcontract was delivered in December 1983."

The documentary evidence likewise conclusively establishes that on February 14, 1984, Richardson directly ordered and paid for, in advance of delivery, 12.2 squares of 1.5B 22–gauge galvanized decking. Other than a payment in the amount of $874.65

---

1. In February, 1984, Escal filed a petition for bankruptcy.

(the invoiced amount) for the 12.2 squares of 1.5B decking, Richardson made no payments to Vulcraft in connection with the Safeway project.

By letter dated January 27, 1984, Vulcraft, acting by and through John R. Bass, notified Safeway and Richardson of the unpaid balance of the debt owed to it by Escal in the amount of $36,952.00, and requested payment of that sum by Safeway and Richardson. The letter was mailed on that date, certified mail return receipt requested, and was received by Safeway and Richardson on January 27, 1984, and January 31, 1984, respectively.

On April 12, 1984, Vulcraft mailed a letter to the County Clerk of Shelby County enclosing its lien affidavit[2] for filing. A copy of this letter and enclosure was sent by certified mail to Safeway. The affidavit was filed for record on April 13, 1984.

At trial only two witnesses gave testimony concerning the events giving rise to the dispute, viz., John Bass and Bob Richardson.

Bass admitted that in his deposition testimony taken before trial, he had stated that the bundle of .6c decking delivered on January 5, 1984, "was actually ordered by Richardson." He stated that his deposition testimony was incorrect, and that the bundle of .6c decking delivered to the job site on January 5, 1984, was delivered pursuant to the Vulcraft–Escal agreement. Bass further testified that Escal's indebtedness was not, in fact, past due under the contract on January 5, 1984.[3]

Richardson testified that he had received a telephone call from either Barry Musick, Vulcraft's regional sales manager, or Bass on or about January 3 or 4, 1984. Richardson testified that he told the person, "we are short some c deck on this project and they indicated that they were concerned about getting their money but if [they had] overlooked shipping that that [they would]

go ahead and ship it in that I had assured them any further monies we paid out *would be paid jointly to them* [Escal and Vulcraft]." (Emphasis ours.)

On cross-examination Richardson specifically conceded that the .6c decking was delivered "under the contract between Escal and Vulcraft." Richardson also related that he paid the premium to St. Paul for the "bond[4] on [the] lien filed by Vulcraft." He testified that he was required to "stand behind [the bond]" as principal.

The trial judge in response to the request of appellants filed findings of fact and conclusions of law. As pertinent here, the findings are as follows, to wit:

. . . .

4. Richardson contracted with Escal Fabrication and Construction Company, Inc. (Escal), in October of 1983 for the furnishing of all necessary structural and miscellaneous steel to complete this project; thereby making Escal a subcontractor.

5. Escal entered into a contract with Vulcraft also in October of 1983 for the supplying of certain joists and decking materials for the Project. Escal's contract with Vulcraft included the purchase and delivery of 22 squares of .6c decking material.

6. Richardson's purchase order contract with Escal provided for a delivery date to be completed "approximately November 1, 1983."

7. Escal's contract with Vulcraft provided that the materials ordered would be shipped the week of November 21, 1983.

8. On December 20, 1983, all of the materials agreed to be furnished by Vulcraft were delivered to the Project, except one square of .6c decking.

9. In the first week of January, 1984, Richardson requested the delivery of the remaining one square of .6c decking, which Vulcraft refused to deliver unless

---

**2.** No question is raised regarding the sufficiency or the form of the affidavit.

**3.** Vulcraft mailed invoices to Escal dated December 20, 1983. The invoices read in part: "Terms ½ of 1% ten days—net 30."

**4.** A copy of the indemnity bond is not a part of the record.

Richardson agreed to pay Vulcraft directly for such additional decking. Vulcraft refused to ship the additional decking to Richardson because the subcontractor (Escal) had failed to pay Vulcraft.

10. Vulcraft delivered the additional decking on January 5, 1984, upon the condition that Richardson agree to pay Vulcraft directly for that material. Richardson timely paid Vulcraft directly for the additional decking which was supposed to have been delivered pursuant to the original purchase order.

11. On April 13, 1984, Vulcraft filed a lien affidavit in Shelby County, Texas. Therefore, the number of days that had expired from:

December 10, 1983, until April 13, 1984 = 124 days

January 10, 1984, until April 13, 1984 = 93 days

February 10, 1984, until April 13, 1984 = 62 days

Based on these findings, the trial judge concluded:

....

3. ... It is not necessary for the Court to find the date on which delivery of the material would normally have been required....

4. Escal's failure to timely pay Vulcraft was a breach of their contractual relationship, and therefore terminated the agreement between Escal and Vulcraft on January 5, 1984, at which time Vulcraft agreed to deliver the additional decking only upon Richardson's assurance of direct payment to Vulcraft for it. The accrual date began [sic] the tenth day of the month following January 5, 1984; that being February 10, 1984.

5. The last shipment made by Vulcraft of materials to this job occurred on January 5, 1984, consisting essentially of one square of .6c decking. The accrual date began [sic] the tenth day of the month following January 5, 1984; that being February 10, 1984.

6. The accrual date of the indebtedness was February 10, 1984, and the lien affidavit was timely filed within ninety days thereafter.

Neither party challenges the findings of fact by point of error in this Court. Therefore, the findings are binding on this Court and the parties to the appeal. *Whitten v. Alling & Cory Co.*, 526 S.W.2d 245, 248 (Tex.Civ.App.—Tyler 1975, writ ref'd).

Appellants urge three points of error. By their first point they contend that we are without jurisdiction to hear this appeal because the trial court granted a new trial and the judgment appealed from has been set aside.

■ As appellants concede, the record contains no written order granting appellants' motion for new trial. The only record showing such action is a docket entry made by the trial judge on March 20, 1987, reading: "Motion for new trial granted." Such an oral pronouncement, although accompanied by written docket entry is not an effective substitute for the written order required by Tex.R.Civ.P. 329b. *Clark & Co. v. Giles*, 639 S.W.2d 449, 450 (Tex.1982). The first point of error is overruled.

Under points two and three appellants contend that Vulcraft "failed to timely file its materialman's lien affidavit," and that Vulcraft's lien was not perfected because Vulcraft failed to comply with the "notice requirements of [Chapter] 53 of the Texas Property Code."

■ Before we discuss appellants' points two and three, we express our agreement with appellants' position that although former Tex.Rev.Civ.Stat.Ann. arts. 5452, 5453, 5455, 5456, and 5467 [5] were in place at the time of the execution of the original contract between Safeway and Richardson and the subcontract between Vulcraft and Escal, it is appropriate that our references to the law governing our decision on their points of error be to the sections of Chapter 53 of Tex.Prop.Code Ann. (Vernon

**5.** Act of June 17, 1961, ch. 382, §§ 1, 2, 4, 5, and 7, 1961 Tex.Gen.Laws 863–868, repealed by Act of June 19, 1983, ch. 576, § 6, 1983 Tex.Gen.

Laws 3729, 3730. All references to articles hereafter made are to the Act of June 17, 1961, unless otherwise indicated.

1984)[6] and particularly to the sections found in Subchapter C thereof.

Appellants' argument under their second point of error is threefold.

First, the material delivered on January 5, 1984, was not referable to the Vulcraft–Escal because it was delivered under an agreement directly with Richardson.[7] Accordingly, under section 53.053(e)(1), Vulcraft's debt accrued on January 10, 1984, and its lien affidavit was filed untimely on April 13, 1984.

Second, the Vulcraft–Escal subcontract required Vulcraft to ship all of the material during the week of November 21, 1983,[8] so the shipment of the material would normally have been required at the job site no later than December 1983. Under section 53.053(e)(2) Vulcraft's debt accrued on January 10, 1984, and the lien affidavit was filed untimely.

Third, the trial court found that Escal breached the contract with Vulcraft on January 5, 1984, resulting in a termination of that agreement;[9] therefore under section 53.053(e)(3) Vulcraft's debt accrued on that date, and the lien affidavit was not timely filed.

Appellants argue under their third point that section 53.058(a)(b) required Vulcraft to give notice to Safeway and Richardson "within 36 days after the 10th day of the month following the month in which [Vulcraft received and accepted] the order for the material." Therefore, appellants assert that the notice given January 27, 1984, was untimely.

■ Appellants acknowledge that section 53.058(f) provides that where a claimant accepts an order for materials and actually delivers the same, his lien is "valid as to delivered items if the claimant has given notice under section 53.056." However, appellants argue that in consideration of general equitable principles Vulcraft should be required to give the notice provided by section 53.058(b).

Appellants further contend under this point that the notice mailed on January 27, 1984, to Safeway and Richardson is insufficient because it did not contain the "statutory warning" required by section 53.056(d) that "the owner may be personally liable [for the debt] and the owner's property may be subjected to a lien...."

Vulcraft, apparently believing that appellants are challenging some of the findings of fact made by the trial judge, asserts that appellants may not do so because they failed to preserve any complaint as to the legal or factual sufficiency of the evidence to support the judgment rendered. We do not so construe the point. The trial court made no finding in respect to any element of the notice issue, and was not required to do so because the date, form and substance of the only written notice given by Vulcraft to Safeway and Richardson is undisputed. *Smith v. Brown Express*, 343 S.W.2d 550, 552 (Tex.Civ.App.—San Antonio 1961, writ ref'd n.r.e.).

We now address appellants' third point. In pertinent part, section 53.056 reads:

(a) A claimant other than an original contractor must give the notice prescribed by this section for the lien to be valid.

(b) If the lien claim arises from a debt incurred by a subcontractor, the claimant must give to the original contractor written notice of the unpaid balance. The claimant must give the notice not later than the 36th day following the 10th day of the month following each month in which all or part of the claimant's labor was performed or material delivered. The claimant must give the same notice to the owner not later than the 90th day after the 10th day of the month following each month in which all or part of the claimant's labor was performed or mate-

---

6. The legislature in enacting the code expressly stated that the code is intended as a "recodification only and no substantial change in the law is intended...." *See* section 7, 1983 Tex.Gen. Laws 3730.

7. The argument is founded on findings 8, 9, and 10 and conclusion 4.

8. Based on finding 7.

9. Based on findings 9 and 10, and conclusion 4.

rial or specially fabricated material was delivered.

. . . .

(d) To authorize the owner to withhold funds under Subchapter D, the notice to the owner must state that if the bill remains unpaid, the owner may be personally liable and the owner's property may be subjected to a lien unless:

(1) the owner withholds payments from the contractor for payment of the bill; or

(2) the bill is otherwise paid or settled.

. . . .

Section 53.058 reads in part:

(a) A claimant who specially fabricates material must give notice under this section for the lien to be valid.

(b) The claimant must give the owner notice not later than the 36th day after the 10th day of the month following the month in which the claimant receives and accepts the order for the material. If the indebtedness is incurred by a person other than the original contractor, the claimant must also give notice within that time to the original contractor.

. . . .

(f) The lien of a claimant who accepts an order but fails to give notice under this section is valid as to delivered items if the claimant has given notice under Section 53.056.

. . . .

We conclude, since it is undisputed that Vulcraft actually delivered the material here involved, that Vulcraft was not required to give the notices set forth in section 53.058(b).

■ We now address appellants' argument that Vulcraft's failure to incorporate the "statutory warning" in its notice defeats its lien.

The pertinent language found in former article 5453, subd. 2, par. b(1),[10] (2) read in part:

Such notices shall be sent by certified or registered mail, addressed to the owner, and where required by this Article to the original contractor, at their last known business or residence address. A copy of the statement or billing in the usual and customary form shall suffice as a notice under this subparagraph; *provided, however, if such statement or billing is to be effective to authorize an owner to retain funds for the payment of such claim as provided in Article 5463 of this Act, it shall contain or be accompanied by some form of statement to an owner to the effect that if the bill remains unpaid he may be personally liable and his property subjected to a lien unless he withholds payments from the contractor for the payment of such statement or unless the bill is otherwise paid or settled.....* (Emphasis added.)

We conclude that a derivative claimant's failure to include the statutory warning now provided by section 53.056(d)[11] does not invalidate his lien,[12] though it does bring about a reduction of the amount of his lien claim against the owner and his property, measured by the aggregate sum of the payments thereafter made by the owner to the original contractor.[13] *Cf. First National Bank in Graham v. Sledge*, 653 S.W.2d 283 (Tex.1983).

■ Moreover in the case before us, Vulcraft is suing on an indemnity bond [14] signed by Richardson as sole principal and St. Paul as surety. Appellants admit in their brief that after Vulcraft filed its lien affidavit, "Richardson executed as Principal a bond with [St. Paul] as Surety to

---

**10.** Quoted here because of its clear explication of section 53.056(d).

**11.** Derived from article 5453.

**12.** We respectfully decline to follow the decision in *Brown v. Dorsett Bros. Concrete Supply, Inc.,* 705 S.W.2d 765 (Tex.App.—Houston [14th Dist.] 1986, no writ).

**13.** Except as to the ten percent retainage mandated by section 53.101. *See* sections 53.081 and 53.084.

**14.** Executed and filed pursuant to sections 53.-171 and 53.172.

indemnify against [Vulcraft's] lien...." This admission is entirely consistent with, and supported by Bob Richardson's undisputed testimony at trial.

The Texas Supreme Court in *Industrial Indemnity Co. v. Zack Burkett Co.*, 677 S.W.2d 493, 495 (Tex.1984), held that the "statutory warning" embodied in former article 5453, subparagraph 2b(2)[15] was "not an essential element of a subcontractor's notice when perfecting a claim against a payment bond."[16]

The rationale for the holding in *Industrial Indemnity Co.* was simply that to require a warning to an owner who is relieved of any liability for the asserted claim amounts to "a meaningless exercise." *Id.* at 495. It is obvious that there are many differences between a payment bond under section 53.201 and an indemnity bond under sections 53.171–53.172. The owner, the original contractor or a subcontractor may become the principal in the indemnity bond, whereas only the original contractor can become the principal in the payment bond. But section 53.171 requires but one principal who may be either the owner, contractor, "or subcontractor through whom the lien is claimed." Here, it is undisputed that Richardson is the sole principal in the indemnity bond. Therefore, Safeway and its property are relieved from any liability on Vulcraft's lien claim[17] because Vulcraft elected to sue on the bond rather than seek foreclosure of its lien.

For the reasons stated, we conclude that Vulcraft's failure to incorporate the "statutory warning" in its January 27, 1984, notice to Safeway does not operate to prejudice Safeway's rights in this suit. *Cf. Industrial Indemnity Co.*, 677 S.W.2d at 495. Accordingly, we reject appellants' arguments that the letter notice of January 27, 1984, to Safeway was deficient. Appellants' third point of error is overruled.

We now consider the three contentions made by appellants under their second point of error. The first contention is that the court erroneously concluded that Vulcraft's debt accrued on February 10, 1984, because Vulcraft's delivery of the bundle of .6c decking on January 5, 1984, was not referable[18] to the Vulcraft–Escal subcontract. Thus, appellants argue that Vulcraft's last delivery of materials to the job site was in the month of December, 1983, the accrual date was January 10, 1984, and therefore the lien affidavit was not timely filed.

Appellants reason that this contention is supported by the trial court's findings of fact eight, nine, and ten. In summary, the court found that Vulcraft refused to deliver the balance of the material covered by the Vulcraft–Escal subcontract unless Richardson agreed to pay for the same; that Richardson agreed to pay Vulcraft for the additional material which was thereafter delivered by Vulcraft on January 5, 1984, and that Richardson did pay for the additional material. We reject this contention. The fact that Vulcraft agreed to deliver the bundle of .6c decking called for by its subcontract with Escal only if Richardson would agree to pay for that material, did not operate to transform Escal's contract to Richardson's contract. In fact, the material delivered on January 5, 1984, was material which was to be delivered under the Vulcraft–Escal subcontract, as the trial court found and as Richardson himself admitted.

Next appellants argue under their second point that because Escal's purchase order provided that Vulcraft would ship the specially fabricated material during the week of November 21, 1983,[19] section 53.-053(e)(2) governs the determination of the

15. Now codified as section 53.056(d), (1), (2).

16. Authorized by former article 5472d, now codified as section 53.201 through section 53.203, section 53.204, sections 53.206–53.209, and section 53.211.

17. Although the judgment was rendered against Safeway jointly and severally, Safeway does not complain on appeal that it was not a principal on the bond, hence, the judgment is erroneous as to it.

18. *See* section 53.053(a), derived from former article 5467–3.

19. The subject of finding of fact number seven.

accrual date which under that section is January 10, 1984. We are not so persuaded. As we read section 53.053, subsection (e)(2) [20] is applicable only where the material is *undelivered.*

■ Appellants' final argument under the point is that since the trial court found (conclusion of law 4) that "Escal's failure to timely pay Vulcraft was a breach of their contractual relationship, and therefore terminated the agreement between Escal and Vulcraft on January 5, 1984," section 53.053(e)(3) controls. Hence, the accrual date is January 5, 1984, not February 10, 1984.

Although misplaced as a conclusion of law, the unchallenged express finding that the subcontract was breached by Escal is a finding of fact. *McAshan v. Cavitt,* 149 Tex. 147, 229 S.W.2d 1016, 1020 (1950). And, as earlier noted, the finding is binding on this court. The trial judge did not expressly find that Escal's breach of the contract was a "material" breach [21] as contemplated by section 53.053(e)(3) [22] and the judge's conclusion that the breach brought about a termination of the contract was one of law, not one of fact. Since neither party to this appeal requested additional findings or conclusions of law, we must presume in support of the judgment that the trial judge found the omitted element supported by the evidence that there was no "material" breach of the subcontract. Tex.R.Civ. P. 299; *F.R. Hernandez Const. v. National Bank of Commerce,* 578 S.W.2d 675, 678–679 (Tex.1979). The second point is overruled.

The judgment is affirmed.

---

**20.** Section 53.053(e)(2) reads:
(e) Indebtedness for specially fabricated material accrues:
(2) on the 10th day of the month following the last month in which delivery of the last of the material would normally have been required at the job site; or

**21.** In fact, the evidence does not even support the finding that Escal breached the contract on January 5, 1984.

**22.** Section 53.053(e)(3) reads:
(e) Indebtedness for specially fabricated material accrues:
(3) immediately on any material breach or termination of the original contract by the owner or contractor or of the subcontract under which the specially fabricated material was furnished.